1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9    Christian Legal Society Chapter at Arizona)    No. CV 04-2572-PHX-NVW
     State University College of Law, a student)
10   organization at the Arizona State)    **ORDER**
     University College of Law, on behalf of)
11   itself and its individual members,    )
                                            )
12              Plaintiff,                  )
                                            )
13   vs.                                    )
                                            )
14                                          )
     Dr. Michael M. Crow, in his official)
15   capacity as President of Arizona State)
     University; Juan C. Gonzalez, in his)
16   official capacity as Vice President for)
     Student Affairs; Robert Soza, in his)
17   official capacity as Assistant Vice)
     President for Student Affairs and Dean of)
18   Students; Brian Goehner, in his official)
     capacity as Coordinator of Student)
19   Involvement;                           )
                                            )
20              Defendants.                 )
     _____)

21

22           Plaintiff Christian Legal Society Chapter at Arizona State University College of

23   Law's Motion for Attorneys' Fees and Costs (doc. # 123) will be granted in part and denied

24   in part.

25   **I.    Nature of the Action and Summary**

26           The Christian Legal Society Chapter at Arizona State University College of Law

27   ("CLS") brought this action for declaratory and injunctive relief against Arizona State

28   University officials ("the University"), alleging interference with its right under the Federal

Constitution to exclude students from its membership and leadership positions "based upon their shared religious beliefs and/or viewpoint regarding homosexual conduct." (Compl. at 17 at ¶ 1.)    After eleven months of litigation, the parties reached a settlement.   The University agreed that registered student organizations may exclude members for lack of shared religious belief, but only insofar as the exclusion does not violate the University's other nondiscrimination policies, including sexual orientation nondiscrimination.  CLS may exclude persons who engage in or approve of sexual conduct, whether heterosexual or homosexual, outside traditional marriage.   CLS now moves for attorneys' fees pursuant to 42 U.S.C. § 1988.

The positions taken by both parties evolved over the course of litigation. CLS brought this action asserting a right to exclude homosexuals specifically but later shifted to a more general claim of right to exclude persons engaging in extramarital sexual conduct, a position to which the University took no exception.   For its part, the University adopted a more stringent position with regard to religiously exclusive student organizations in defending this litigation than the University had ever historically enforced. (doc. # 96 at 6:3-25.)  Although religious student groups had never been stopped from defining membership and officership based on shared religious beliefs, in this litigation the University took a general position that religious student groups could not exclude persons of different religious beliefs. By the end of the litigation, however, the University acquiesced on the point. Religious student groups may now exclude members of different religious beliefs so long as the discrimination is not also based on a prohibited characteristic.  Despite these significant shifts in both parties' positions, and perhaps naturally on an attorneys' fees motion, both CLS and the University argue that their own position remained unchanged and the settlement was reached because the other party accepted defeat.  In reality both parties accepted some defeat.

This action was brought to establish a principle of law and was expressly framed as such.  When CLS filed this action, the University had not denied CLS registration as a student organization and CLS had not applied for it.  Rather, CLS attempted to craft exactly

1   the legal question it wished to litigate by writing a letter to the University stating what the

2   University's policies meant, proclaiming them unlawful, and demanding an exemption from

3   them.  Though the University withdrew the objectionable language from the application

4   form, CLS filed this action, asserting that the Student Code of Conduct also required CLS

5   to accept homosexuals.  CLS staked out this contention in its Complaint, which asserted that

6   the University's nondiscrimination policy infringed CLS's religion-based constitutional right

7   to exclude homosexuals.[1]   Faced with this *Bob-Jones*-like[2] claim to government

8   accommodation of focused discrimination against homosexuals, the University resisted.

9        Because this declaratory judgment litigation was not grounded in actual harm inflicted

10  by the University but in CLS's refusal to apply for recognition on the specific claim of

11  principle it articulated, CLS's articulation, alleged in its Complaint, takes on critical

12  importance for finding who prevailed and how successful they were.  The bare fact that CLS

13  had recognition in the end and not in the beginning does not answer either question.  Though

14  CLS would so cast it now, this litigation was never about University recognition directly.

15  It was about the reason CLS would not apply for recognition, and now it is about whether

16  CLS vindicated or yielded that reason when it did apply in the end.

17

18      [1]The court recognizes the conduct-status distinction explicitly stated in the Complaint.
    While the Complaint maintained CLS's right to exclude persons "engag[ing] in homosexual
19  conduct or adher[ing] to the viewpoint that homosexual conduct is not sinful," it disavowed
    any intent to exclude persons based on their sexual *orientation* independent of their conduct
20  or viewpoint.  (Compl. ¶ 3.8.)  For the sake of economy of expression, the court will refer
    to CLS's original avowed category of discrimination as homosexual discrimination while
21  keeping in mind CLS's own intention not to exclude  persons for mere status without conduct
    or opinion.  Without diminishing the sincerity or the importance to CLS of its distinction, the
22  distinction does not remove CLS's exclusionary policy as alleged in its Complaint from the
    fair meaning of discrimination based on sexual orientation.  The University may reasonably
23  interpret its policy as protecting persons "engaging in homosexual conduct" as well as
24  celibate homosexuals.

25

26      [2]*See Bob Jones Univ. v. United States*, 461 U.S. 574, 602-04 (1983) (rejecting private
    university's argument that its religious interest in racial discrimination required governmental
27  accommodation of that discrimination).

28                                        - 3 -

II.      **Facts and Procedural History**

      A.      **Christian Legal Society's History at ASU and Statement of Faith**

      For at least fourteen years CLS operated as a student organization at the University and registered intermittently with the University. (doc. # 142 Ex. 5.) When it registered, CLS also submitted a Student Organization Registration Form by which it warranted the following:

> Membership privileges (including all rights to vote and hold office) will be extended to any qualified individual without regard to race, color, religion, national origin, citizenship, sex, sexual orientation, age, disability, or veteran status.

(*E.g.*, *id.* at Ex. 5 at 00077, 00079, 00080, 00082.) Filling out these renewal forms entitled CLS to the benefits of University registration such as free photocopies, posters, sound equipment rentals, lockers, and a mailbox. (Compl. ¶ 3.15.)

      CLS's standard of common interest and membership is the Statement of Faith adopted by CLS's national organization. The Statement of Faith reads:

> Trusting in Jesus Christ as my Savior, I believe in:
>
> •      One God, eternally existent in three persons, Father, Son and Holy Spirit.
>
> •      God the Father Almighty, Maker of heaven and earth.
>
> •      The Deity of our Lord, Jesus Christ, God's only Son conceived of the Holy Spirit, born of the virgin Mary; His vicarious death for our sins through which we receive eternal life; His bodily resurrection and personal return.
>
> •      The presence and power of the Holy Spirit in the work of regeneration.
>
> •      The Bible as the inspired Word of God.

(*Id.* at ¶ 3.7.)

      B.      **Commencement of Litigation**

      In the Fall of 2004, some CLS members became concerned that the non-discrimination policy might require CLS to accept members who did not share their faith, though neither CLS nor any of the University's more than forty other religiously-based

- 4 -

1    registered student organizations had ever had such an incident.  In addition, some students

2    had learned of litigations brought by other Christian Legal Society chapters against other

3    universities challenging sexual orientation non-discrimination policies similar to the

4    University's.  CLS's membership voted to authorize litigation against the University's non-

5    discrimination policy.

6          By letter of September 29, 2004, CLS requested through its counsel an exemption

7    from the University's nondiscrimination policy.    The letter to the University stated:

8               [CLS] requires its members and officers to sign and endeavor to
               live by the national Christian Legal Society's Statement of Faith.
9                    CLS interprets its Statement of Faith to require that
               officers and members adhere to orthodox Christian beliefs,
10              including the Bible's prohibition of sexual conduct between
               persons of the same sex.  A person who engages in homosexual
11              conduct or adheres to the viewpoint that homosexual conduct is
               not sinful would not be permitted to serve as a [CLS] officer or
12              member.

13   (doc. # 142 Ex. 11 at 2.)   Asserting that the University's "policy prohibits student

14   organizations from selecting members and officers on the basis of religion and sexual

15   orientation," CLS counsel's letter requested "an exemption from the religion and sexual

16   orientation portions of the University Nondiscrimination Policy."  (*Id.*)

17         In response on October 15, 2004, the University removed from its registration packet

18   the non-discrimination language to which CLS objected and advised CLS that it must file an

19   application for registration like all other student groups.  (Compl. Ex. F; *id.* at Ex. H.)  The

20   amended registration packet retained the requirement that student organization sponsors

21   certify that their group was in compliance with the Student Code of Conduct.  (*Id.* at Ex. F;

22   *compare id.* at Ex. E.)  The Student Code of Conduct prohibits "[e]ngaging in discriminatory

23   activities, *whether unlawful or whether prohibited by university policy*, on the basis of age,

24   ethnicity, gender, disability, color, national origin, race, religion, sexual orientation, or

25   veteran status."  (doc. # 96 at 3:8-11 (emphasis added).)  The Student Code of Conduct has

26   no independent content; it merely references discrimination that is "unlawful" or "prohibited

27   by university policy."

28
                                        - 5 -

1    Rather than submitting an application on the new form or inquiring further, CLS

2  brought this action on November 17, 2004, seeking recognition without certifying

3  compliance with the non-discrimination term of the Student Code of Conduct. CLS alleged

4  (1) that its officers and members were required to adhere to the Bible's prohibition against

5  sexual conduct between persons of the same sex and (2) that a person engaging in

6  homosexual conduct or believing homosexual conduct is not a sin would not be permitted

7  to serve as an officer or member. (Compl. ¶ 3.8.) The Complaint sought declaratory and

8  injunctive protection of CLS's and its members' right to "select members, leaders, and

9  officers based upon their shared religious beliefs and/or viewpoint regarding homosexual

10  conduct." (*Id.* at 17 at ¶ 1.)

11    **C.    Ambiguity and Resolution of the Religious Discrimination Challenge**

12    The Complaint, like the September 29, 2004 letter, posed religious freedom as the

13  basis for a right to exclude homosexuals specifically. However, the Complaint did not

14  clearly pose a more general challenge to forced acceptance of students of other faiths in faith-

15  defined groups. Nor did it allege a factual basis and case or controversy for such a challenge

16  unless it is entailed in CLS's specific claim of religious right to target homosexuals for

17  exclusion.

18    When CLS filed its complaint, the University had no published written statement of

19  policy concerning religious non-discrimination in organization membership. The University's

20  previous statements of policy had no history of enforcement one way or the other. Those

21  former statements were written at the highest level of generality and could be absolute or, in

22  context, could be taken as implicitly allowing organizing by religious beliefs. Prohibition

23  of religious discrimination might speak only to exclusion that is irrelevant to the organizing

24  common interest. Where the common interest is religion and religions are mutually

25  exclusive, the measures of inclusion and exclusion are reciprocal and benign. Exclusion

26  from such an organization for most students would carry no stigma because non-adherence

27  to the shared religion carries none.

28

1    Thus, the University could have intended any prohibition of religious discrimination

2    in membership as permitting religion-exclusive registered student organizations in general,

3    but not to circumvent other nondiscrimination policies; or it could have intended not to

4    recognize any religion-exclusive organization at all.  Apparently the issue never came up and

5    the University never thought about it before this litigation.  In resisting CLS's claim of

6    religious right to target homosexuals for exclusion, however, the University took the position

7    that religious belief may not be used either as an exclusive criterion of common interest or

8    as a specific criterion of exclusion.

9    For example, on April 21, 2005, five months into this litigation, the University again

10   amended its registration forms to restore the previously deleted language requiring sponsors

11   to certify that "[m]embership and all privileges . . . [are] extended to all students without

12   regard to . . . creed, . . . religion [or] sexual orientation."  (doc. # 96 at 5:23-6:2.)  While the

13   restoration of this language alone did not resolve its ambiguity, in interrogatory responses

14   the University later explained that CLS's articulated policies would violate *both* the

15   "religious" and "sexual orientation" prongs of the University's nondiscrimination policy.

16   (doc. # 143 Ex. 1 at 6:4-7:8.)  The University noted specifically that "excluding university

17   students from membership and leadership because of those students' religion [] would

18   constitute discriminatory activities." (*Id.* at Ex. 1 at 7:6-7:8.)  Even earlier in the University's

19   motion to dismiss, it implied a general objection to exclusion for lack of shared religious

20   beliefs, providing as an example of problematic conduct that CLS would bar from

21   membership persons of different faiths.  (doc. # 26 at 4 n.2 (arguing that CLS "would bar

22   from membership persons belonging to the Church of Jesus Christ of the Latter-Day Saints");

23   *see also id.* at 5:5-8.)  Finally, in a public statement the University's Deputy General Counsel

24   explained, "Initially I think people thought this lawsuit was about sexual orientation, but it

25   is really as much about religious discrimination."  (doc. # 143 Ex. 9 at Ex. A at 3.)

26

27

28

- 7 -

Although the University now contends that it had no desire to litigate over whether religious groups could exclude for lack of shared religious beliefs generally, the University did litigate it.

### D.    The Challenge to Case or Controversy and CLS's Revised Position on Sexual Orientation Discrimination

At the April 15, 2005 oral argument on the motion to dismiss the Establishment Clause claim, the court ordered CLS to show cause why the Complaint should not be dismissed for lack of a case or controversy. (doc. # 63.)  The University was eager to defend and litigate its policy against targeted exclusion of homosexuals from registered student organizations, but the premise of the lawsuit may have been nothing more than lawyers' letters disagreeing on legal points.

In response, CLS filed an application for registration with the University, attaching a letter dated May 6, 2005, stating CLS's qualifications to the required general certification of compliance with the Student Code of Conduct and explaining CLS's "potential conflict." (doc. # 74 at 6:14-21; *id.* at Ex. A at 1.)  CLS's letter, however, did not seek focused exclusion of homosexuals.  Rather, the letter described CLS's Statement of Faith as:

> requir[ing] that officers and members live moral lives in accordance with orthodox Christian belief including the Biblical prohibition of sexual activity or practice outside of heterosexual marriage (this includes a prohibition against adultery, sexual promiscuity, homosexual activity, and pornography).  A person who engages in prohibited sexual conduct or adheres to the viewpoint that prohibited sexual conduct is not sinful would not be permitted to serve as a CLS chapter officer or member. . . . To be clear, [CLS] does not prohibit any person from becoming a member or officer solely on the basis of their status as an individual whose sexual inclinations are toward those of the same sex, but it does require that its voting members and officers agree with the theological and creedal belief that prohibited sexual conduct is sinful, that they repent of any such conduct, and that they not engage in such conduct.

(*Id.* at Ex. A at 3.)  CLS had thus changed its position; its criterion of exclusion was expanded to oppose all sexual activity outside traditional marriage.  CLS was no longer seeking to discriminate against homosexuals as a targeted group.  However, CLS did not seek

1  to amend its Complaint to reflect this different claim, and it contends even now that this letter

2  did not alter its position.

3      The University rejected CLS's application on May 13, 2005, noting that the University

4  could not accept an application which asserted non-compliance with the University's policies.

5  (*Id.* at Ex. B at 1.)

6      Litigation continued through trial preparation and briefing.  In its principle brief filed

7  July 28, 2005, CLS asserted no right to exclude homosexuals as such, but only to exclude

8  persons who engaged in or condoned sexual conduct outside traditional marriage.  (doc. #

9  96 at 2:18-25.)  In response, the University stated:

10          In its Motion, CLS-ASU now claims to discriminate against
            those who engage in "extra-marital sexual conduct."  (Op. Br.
11          at 2.)  Discrimination on the basis of engaging in extra-marital
            sexual conduct is not prohibited by University policy.
12          Accordingly (and setting aside CLS-ASU's insistence on
            discriminating on the basis of religion), if CLS-ASU genuinely
13          only discriminates on the basis of extra-marital sexual
            conduct–and applies its policy equally to heterosexuals and
14          homosexuals–it would be able to sign the SOCR registration
            form, and commit to abide by the Nondiscrimination Policy.
15

16  (doc. # 101 at 10 n. 4.)

17      **E.    The Settlement**

18      The parties then reached a settlement.  The stipulated order of dismissal stated that the

    parties were able to resolve the dispute privately, and the court retained jurisdiction only to

19  rule on attorneys' fees motions.   Three paragraphs of the settlement agreement are

20  particularly relevant:

21          **2.    SORC Registration Policy Amendment.**  No
22          later than upon the execution of this Agreement, the University
            will state and publish in the Student Organization Resource
23          Center ("SORC") registration documents and website wherever
            the nondiscrimination policy is published the following:
24                  Religious student organizations will not be denied
            registration solely because they limit membership or
25          leadership positions to students who share the same
            religious beliefs.   These groups, however, may not
26          discriminate in membership or leadership on any other
            prohibited basis (i.e. age, ethnicity, gender, disability,
27

28                              - 9 -

color, national origin, race, sexual orientation or veteran status).

      **3.**    **SORC Registration.**  Simultaneously with the execution of this Agreement, [CLS's] application for registration as a 2005-2006 student organization, without the May 6, 2005 cover letter previously submitted, will be received and granted.

      **4.**    **University Letter.**  Simultaneously with the execution of this Agreement, the University will issue to [CLS] a letter in the form attached hereto in Exhibit A.

(doc. # 129 at Ex. C at 2.)  The letter referred to in paragraph 4 states in relevant part:

    Please be advised that:

    . . . .

    2.    The beliefs and practices of [CLS] that any sexual conduct, whether heterosexual or homosexual, outside of a traditional marriage is morally wrong, do not violate the sexual orientation provision in the non-discrimination policies of the University as they relate to the registration of student organizations.  Any complaint filed with the University against [CLS] will be decided consistent with this agreement.

As Vice President for Student Affairs, I represent that I have authority to bind the University with respect to the matters stated in this letter.

(*Id.* at Ex. C at 7.)  Following the settlement agreement, CLS moved for attorneys' fees in the amount of $341,210.80, which reflects $266,161.70 in hourly rate value plus costs of $8,135.68 and a multiplier of 1.25.  (doc. # 127 at 2 n.1.)

## III.    Prevailing Party

    Section 1988 of Title 42, U.S.C., provides that in civil rights litigation the court "may allow the prevailing party, other than the United States, a reasonable attorney's fee."  A party's status as "prevailing" is thus a threshold requirement for an award of fees.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989).

    A civil rights plaintiff must meet two elements as a prevailing party; the first "requires a material alteration in the legal relationship between the parties," and the second "requires that the material alteration in the relationship between the parties be stamped with some

1  'judicial imprimatur.'" *Carbonell v. Immigration & Naturalization Servs.*, 429 F.3d 894, 899,

2  901 (9th Cir. 2005).

3      **A.    Material Change in Legal Relationship**

4      The Supreme Court has articulated a "generous formulation" of the material change

5  element. *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (citing *Hensley*, 461 U.S. at 433). The

6  element is satisfied "[i]f the plaintiff has succeeded on any significant issue in litigation

7  which achieved some of the benefits the parties sought in bringing suit." *Tex. State Teachers

8  Ass'n*, 489 U.S. at 791-92 (citations, alterations and internal quotations omitted). This

9  "inquiry does not turn on the magnitude of the relief obtained"; although "the size of the

10  relief may impact the size of the eventual fee award, it does not affect *eligibility* for a fee

11  award." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (citations and internal

12  quotations omitted). Even nominal damages of one dollar may thus constitute a material

13  change in the parties' relationship. *Farrar*, 506 U.S. at 112.

14      CLS has achieved through private settlement agreement a sufficient alteration of the

15  parties' legal relationship. The ability "to enforce a judgment, consent decree, or settlement

16  against the defendant" will generally satisfy the material change element because "the

17  plaintiff can [thereafter] force the defendant to do something he otherwise would not have

18  to." *Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002) (citing

19  *Fischer*, 214 F.3d at 1118)); *accord Richard S. v. Dep't of Developmental Servs.*, 317 F.3d

20  1080, 1087 (9th Cir. 2003). The University has abandoned its policy, never before enforced

21  but articulated in this litigation, against recognizing religiously-exclusive student

22  organizations in general.

23      CLS may also compel the University to post notices on its forms and web sites that

24  religious groups may discriminate on the basis of certain shared religious beliefs, so long as

25  the discrimination is not also based on any protected characteristic. (doc. # 129 at Ex. C at

26  2 at ¶ 2.) A comparable settlement agreement was held to effect a material change in the

27  litigants' legal relationship in *Fischer*, 214 F.3d at 1115. In *Fischer*, the Cedar Creek Inn

28

1  agreed to insert an expanded nondiscrimination statement into its policy manual and to post

2  the statement conspicuously.  *Id.* at 1120.  The court held that the parties' relationship was

3  significantly changed, given that such a statement would "go a long way toward educating

4  the Inn's employees and agents that it is illegal to deny access to people who use service

5  dogs."  *Id.*  The court reached this conclusion despite the fact that the language only added

6  "a few sentences" to the Inn's prior nondiscrimination policy.  *Id.*

7         **B.    Judicial Imprimatur**

8         The settlement agreement also satisfies the requirement of judicial imprimatur.

9  Generally, "in order to be considered a 'prevailing party' . . . a plaintiff must not only achieve

10  some material alteration of the legal relationship of the parties, but that change must also be

11  judicially sanctioned." *Shapiro v. Paradise Valley Unified Sch. Dist.*, 374 F.3d 857, 865 (9th

12  Cir. 2004) (citations and internal quotations omitted).  The University argues that private

13  settlement agreements lack judicial imprimatur under *Buckhannon Board & Care Home, Inc.*

14  *v. West Virginia Department of Health & Human Services*, 532 U.S. 598 (2001).  In

15  *Buckhannon*, the Court distinguished voluntarily-conceded relief from court-ordered forms

16  of relief like judgments on the merits and consent decrees.  *Id.* at 604-05.  Although no

17  settlement agreement was involved, the Court further stated in dictum that relief obtained

18  through private settlement agreements would not support an award of attorneys' fees unless

19  the agreement was incorporated into a court order.  *Id.* at 604 n.7.

20         The Ninth Circuit  has consistently rejected *Buckhannon*'s dictum that settlement

21  terms must be incorporated into a court order to allow a fee award.  *Barrios*, 277 F.3d at 1134

22  n.5; *Richard S.*, 317 F.3d at 1086-87; *see also Perez-Arellano v. Smith*, 279 F.3d 791, 795

23  n.5 (9th Cir. 2002).  Ninth Circuit authority controls here.  In *Barrios*, as here, the parties

24  agreed to a court decision on attorneys' fees, without judicial incorporation or enforcement

25  of the settlement.  277 F.3d at 1133, 1134 n.5.  The court's retention of jurisdiction over

26  attorneys' fees "provid[ed] sufficient judicial oversight."  *Id.* at 1134 n.5.  Under *Barrios*,

27  CLS meets the requirement of judicial imprimatur.

28                                    - 12 -

**IV.    Amount of Fee**

Having determined that CLS is a prevailing plaintiff under 42 U.S.C. § 1988, the court must determine the amount of fees appropriate to award CLS.  "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. This yields what is referred to as the "lodestar."  *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Cir. 2000).  After calculating the lodestar, "other considerations . . . may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'"   *Hensley*, 461 U.S. at 433 (footnote omitted). There is a strong presumption, however, that the lodestar figure represents a reasonable fee. *Morales v. City of San Rafael*, 96 F.3d 359, 364 (9th Cir. 1996).

**A.    Determination of Reasonable Fees for the Level of Success**

The University has not objected to CLS's hourly rate values for service rendered, and the court finds them reasonable.    Nor has the University objected to any specific services or the claimed $266,262.70 value of CLS's counsel's services in general, and the court finds that value reasonable.   The court also considers the other factors bearing on the reasonableness of fees. *Morales*, 96 F.3d at 364 n.8; *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).  With the exception of results obtained, those pertinent factors do not warrant departure from the lodestar amount claimed by CLS.

In determining the hours reasonably expended, "two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?   Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Hensley*, 461 U.S. at 434. The court addresses these two inquiries in turn.

**1.    Relatedness of Claims**

"If the plaintiff has prevailed on some claims but not on others, the court must evaluate whether the successful and unsuccessful claims are distinctly different claims for

- 13 -

1    relief that are based on different facts and legal theories or whether they involve a common

2    core of facts or are based on related legal theories." *Schwartz v. Sec'y of Health & Human*

3    *Servs.*, 73 F.3d 895, 901 (9th Cir. 1995) (internal citations, alterations and quotations

4    omitted).  Determining the relatedness of claims is not a precise science.  *Webb v. Sloan*, 330

5    F.3d 1158, 1169 (9th Cir. 2003); *see also Hensley*, 461 U.S. at 437 n.12 ("We recognize that

6    there is no certain method of determining when claims are 'related' or 'unrelated.'").  As a

7    starting point, though, it can be assumed that civil rights cases involving unrelated claims are

8    encountered infrequently.  *See Hensley*, 461 U.S. at 435.

9        "[T]he test is whether relief sought on the unsuccessful claim is intended to remedy

10    a course of conduct entirely distinct and separate from the course of conduct that gave rise

11    to the injury on which the relief granted is premised."  *Schwarz*, 73 F.3d at 903 (citations and

12    quotations omitted).  Claims are thus unrelated only if the "successful and unsuccessful

13    claims are distinctly different *both* legally *and* factually."  *Dang v. Cross*, 422 F.3d 800, 813

14    (9th Cir. 2005) (citations and internal quotations omitted) (emphasis in original).  The court

15    should also ask "whether it is likely that some of the work performed in connection with the

16    unsuccessful claim also aided the work done on the merits of the successful claim."  *Schwarz*,

17    73 F.3d at 903 (alterations omitted) (citing *Herrington v. County of Sonoma*, 883 F.2d 739,

18    747 (9th Cir. 1989)).  Once separated, any work performed on claims unrelated to winning

19    claims is not compensable.  *Hensley*, 461 U.S. at 435.

20        Here, CLS's failed claims–targeted exclusion of homosexuals in practical terms and

21    its Establishment Clause claim in doctrinal terms–were not wholly unrelated to CLS's

22    successful claim based on a general but otherwise nondiscriminatory exclusion of persons

23    for lack of shared religious beliefs. The practical results of the successful and unsuccessful

24    claims were or would have been materially different, but CLS's claims were "premised on

25    the same set of circumstances," at least in the minimal sense to allow their further

26    consideration in the level of success.  *Cabrales v. County of Los Angeles*, 864 F.2d 1454,

27    1466 (9th Cir.), *vacated*, 490 U.S. 1087, *and reinstated*, 886 F.2d 235 (1989).  Work on each

28                                    - 14 -

1    constitutional claim, moreover, surely overlapped with work on the others, especially

2    considering the overlapping nature of the religion clauses.  Because this case "cannot be

3    viewed as a series of discrete claims," *Sorenson v. Mink*, 239 F.3d 1140, 1147 (9th Cir. 2001)

4    (citations and internal quotations omitted), the court need not disregard any of CLS's

5    counsel's hours as performed on wholly unrelated claims.

6        However, this analysis is only a preface to the important inquiry about levels of

7    success among those related claims.

8                    **2.    Level of Success**

9        The law authorizes the district court to reduce a fee award for lack of complete

10   success.  *McGinnis v. Kentucky Fried Chicken*, 51 F.3d 805, 801 (9th Cir. 1994) ("It is an

11   abuse of discretion for the district court to award attorneys' fees without considering the

12   relationship between the extent of success and the amount of the fee award." (citations and

13   internal quotations omitted)); *Cabrales*, 864 F.2d at 1466 n.11; *Morales*, 96 F.3d at 364;

14   *accord Caudle*, 224 F.3d at 1029 n.11 ("If . . . a plaintiff has achieved only partial or limited

15   success, the lodestar figure may be an excessive amount.  This will be true even where the

16   plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." (citations,

17   quotations and alterations omitted)).  In determining the amount of fees reasonably awarded,

18   success is the "crucial factor." *Hensley*, 461 U.S. at 440.  Here, the award must reflect CLS's

19   predominant lack of success in this litigation.

20                    **i.    Benchmark of Success**

21       To measure success, the court must find the plaintiff's goals in bringing the action and

22   compare them to the final results of the litigation.  *See Harris v. Marhoefer*, 24 F.3d 16, 18-

23   19 (9th Cir. 1994) ("The degree of the plaintiff's success in relation to the . . . goals of the

24   lawsuit is a factor critical to the determination of the size of a reasonable fee . . . ." (emphasis

25   omitted; citing *Texas State Teachers Ass'n*, 489 U.S. at 790)).  Where, as here, the plaintiff's

26   objectives materially changed in the course of the litigation, the court must decide which

27   objectives are the benchmark of success.  In this case, two options are salient: (1) CLS's

28                                - 15 -

1    stated position in its Complaint, never amended, and (2) CLS's stated position in the May 6,

2    2005 letter appended to CLS's application for registration and in its July 28, 2005 brief on

3    the merits (doc. # 96).  The court concludes that CLS's success on the sexual discrimination

4    claim should be measured against CLS's goals apparent in its Complaint, for three main

5    reasons.

6         First, out-of-court assertions by counsel for a party in litigation are not necessarily

7    binding and must be understood in light of the ongoing litigation.  Although the May 6, 2005

8    letter communicated a different position than alleged in the Complaint and in CLS's

9    September 29, 2004 letter, CLS did not commit to the new position in a legally binding way

10   upon which the University could rely.  The University could not be expected upon receiving

11   the May 6 letter to ignore CLS's Complaint, which described CLS's demand to discriminate

12   against homosexuals as a targeted group.

13        This principle has particular force here.  In a prior court filing CLS affirmed that it did

14   not consider itself restricted by the contents of CLS counsel's extrajudicial letters.   In

15   responding to the University's motion to dismiss CLS's Establishment Clause claim, CLS

16   asserted that theories expressed in a prior extrajudicial letter in no way limited the range of

17   permissible arguments that CLS could make before the court.  (doc. # 32 at 11.)  Where a

18   party has specifically repudiated the legal effect of its out-of-court statements, logic and

19   fairness should disincline the court to charge the opposing party with finding in them legal

20   significance in derogation of the operative Complaint.

21        Second, CLS did not acknowledge in the May 6, 2005 letter that it was changing its

22   position.  (*See* doc. # 74 Ex. A.)  To the contrary, the May 6 letter refers approvingly to

23   CLS's earlier September 29, 2004 letter, which paralleled the Complaint in terms of

24   homosexual targeting.  (*Id.* at Ex. A at 1.)  CLS's May 25, 2005 Response to Show Cause

25   Order (doc. # 74), which attached the May 25, 2005 letter, is also silent about its change in

26   position.  Not even on this attorneys' fees motion does CLS admit its change of position.

27   This further suggests the unfairness of charging the University with recognizing CLS's

28
                                        - 16 -

1    change of posture without an amendment of its Complaint or other legally binding
2    retrenchment.

3          Third, it strains judicial resources to permit parties who extrajudicially change their
4    position to call upon the court to investigate a course of litigation dealings or negotiations.
5    As noted generally by the Supreme Court, "[a] request for attorney's fees should not result
6    in a second major litigation." *Hensley*, 461 U.S. at 437. Parties who do not amend their
7    pleadings or otherwise formally and clearly commit to a new and retrenched position should
8    not be heard to say on an attorneys' fees motion that a course of extrajudicial dealings
9    inconsistent with their unamended pleadings provides the new measure of their objectives
10   and success in the litigation.

11                              **ii.    CLS's Objectives at the Beginning**

12         Having decided that CLS's objectives in its Complaint are the appropriate benchmark
13   of CLS's success, the court must determine what they were. CLS's main goal in this litigation
14   was to establish a principle that CLS's religion-based rights trumped the University's sexual
15   orientation nondiscrimination policy prohibiting express discrimination against homosexuals
16   by University-aided student organizations. The Complaint evidences this primary litigation
17   objective, describing CLS's policy in terms of homosexual exclusion.

18         Other circumstances confirm that CLS sought predominantly to establish the principle
19   that CLS could target homosexuals for exclusion. The September 29, 2004 letter requesting
20   an exemption from the University's nondiscrimination policy spoke in terms of purely
21   homosexual discrimination (doc. # 142 Ex. 11 at 2), as does other correspondence in the
22   record. (*E.g.*, *id.* at Ex. 14 at 1288 ("Speculative future attempts by homosexuals to become
23   leaders is one of the reasons we filed the suit. We want to make sure we end up with the
24   right to exclude practicing homosexuals.").)

25                      **iii.   CLS's Original Objectives Compared to the Results
                                 Achieved**
26         In light of CLS's dominant objective, this litigation was only modestly successful. To
27   be sure, CLS is entitled to "prevailing party" status, having obtained binding commitments

28                                          - 17 -

1   to its right to discriminate generally on the basis of shared religious beliefs — although not

2   specifically against homosexuals. The settlement agreement states: "These groups, however,

3   may not discriminate in membership or leadership on any other prohibited basis (i.e., age,

4   ethnicity, gender, disability, color, national origin, race, *sexual orientation* or veteran

5   status)." (doc. # 129 Ex. C at 2 at ¶ 2 (emphasis added); *id.* at Ex. C at 7 at ¶ 1.) The

6   circumstances leave some doubt whether at the outset the University would have opposed

7   a general claim to benign religious exclusion as a stand-alone issue, unconnected with the

8   specific claim to religiously entitled exclusion of homosexuals as such. But the University

9   did raise that objection and then relented in the settlement. The University must pay an

10  amount that is reasonable for that success achieved.

11       However, the settlement abandoned CLS's claim to discriminate against homosexuals

12  as such, confirming a right to discriminate of a very different kind. CLS ended the litigation

13  with a previously uncontested right to exclude all persons who engage in extramarital sexual

14  conduct, "whether heterosexual or homosexual." (*Id.* at Ex. C at 7 at ¶ 2.) But any registered

15  group could exclude by that broader classification because it does not violate any

16  specification of the University's nondiscrimination policy. Only a general and even-handed

17  exclusion is permitted, by a criterion that does not single out by sexual orientation.

18       This even-handed criterion disparately impacts homosexuals, *cf. Alexander v.*

19  *Sandoval*, 532 U.S. 275, 282-85 (2001) (distinguishing direct discrimination from disparate

20  impact), but the invidiousness of the resulting discrimination is greatly diminished. While

21  invidious classification and disparate impact from general classification each has its sting,

22  they differ in their social, psychological, political, moral, and educational character. The

23  University could reasonably understand invidious classification–targeting homosexuals as

24  such–as destructive of the learning environment but disparate impact discrimination as less

25  so. The University never relented in resisting the first and never opposed the second. At the

26  end of the battle, CLS held ground for which it needed no army, and the University held

27  ground which was the declared cause of war.

28

- 18 -

1      Considering the importance of invidious classification in this litigation and the fact

2   that the University turned back CLS's claim to target homosexuals as such for exclusion, the

3   relief actually obtained by CLS, "however significant, [was] limited in comparison to the

4   scope of the litigation as a whole." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)

5   (quotations omitted) (citing *Hensley*, 461 U.S. at 440).

6                    **3.      Application of Discretionary Reduction of Fees**

7      A "district court should award only those fees which are reasonable in relation to the

8   result obtained." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1027 (9th

9   Cir. 1985) (citations omitted).  Where a plaintiff, as here, is only partially successful, the

10   court exercises its discretion "to arrive at a reasonable fee award, either by attempting to

11   identify specific hours that should be eliminated or by simply reducing the award to account

12   for the limited success of the plaintiff." *Tex. State Teachers Ass'n*, 489 U.S. at 789-790

13   (citations omitted).

14      Reduction of the attorney hours by a reasoned percentage is permissible under the

15   Ninth Circuit rule that "a district court does not abuse its discretion when it resorts to a

16   mathematical formula, even a crude one, to reduce the fee award to account for limited

17   success." *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 905 (9th Cir. 1995).  In

18   *Marhoefer*, 24 F.3d at 16, for example, the Ninth Circuit affirmed a district court's reduction

19   in fees of 50% "based upon the 'results obtained,' i.e., the amount of damages recovered

20   versus the amount sought, and the number of claims prevailed upon versus the number of

21   claims dismissed or decided in defendant's favor." *Id.* at 18 (citations omitted).  While the

22   Ninth Circuit has reversed lower court decisions utilizing the "meat axe" approach to reduce

23   excessive or duplicative billings that inadequately articulate the reasons for selecting the

24   specified percentage reduction, *e.g. Gates v. Deukmejian*, 987 F.2d 1392, 1400 (9th Cir.

25   1992) (reversing 10% reduction based on overlap or duplication in work), percentage

26   reductions can be "acceptable, and perhaps necessary, tools for district courts fashioning

27   reasonable fee awards."  *Id.*  Where other methodologies are not available to reduce the

28                                          - 19 -

1    award to an amount commensurate with the level of success, percentage reductions will be

2    upheld.  *Webb v. Sloan*, 330 F.3d 1158, 1167-68 (9th Cir. 2003) (district court did not err in

3    reducing number of hours by 25% to reflect limited success although reversal on other

4    grounds was appropriate); *Schwarz*, 73 F.3d at 904-905 (district court did not err in reducing

5    hours by 25% to reflect lack of success); *Corder v. Gates*, 947 F.2d 374, 378 (9th Cir. 1991)

6    ("It is clear that a 20% reduction for limited success is in some cases sustainable.").  "The

7    court necessarily has discretion in making this equitable judgment."  *Hensley*, 461 U.S. at

8    436-37.

9            From the foregoing discussion the court concludes that a fee award should and must

10   be reduced for the services challenging the University's sexual orientation nondiscrimination

11   policy.  When in its principal brief CLS omitted its prior claim to targeted homosexual

12   exclusion, the University promptly stated what it surely would have said if CLS had taken

13   the same position before suit: that the sexual orientation nondiscrimination policy does not

14   prohibit exclusionary criteria applicable to heterosexuals and homosexuals alike.  (doc. # 101

15   at 10 n. 4.)  It was not necessary for CLS to prosecute a lawsuit to learn that or to decide

16   what its own goals were.

17           The task, then, is to quantify CLS's success on the benign religious exclusion issue,

18   with allowance for overlap in work between it and the failed claims.  This court has reviewed

19   afresh all the briefs in this case.  The court has labored through CLS's time entries, and they

20   are simply not amenable to the preferred method of fee reduction by excluding identified

21   entries from the loadstar calculation.  The time entries are overwhelming general in their

22   descriptions of work on the case and leave little basis to quantify how much was expended

23   on the failed sexual orientation claim, the religious association claim as integral to the failed

24   sexual orientation claim, the religious association claim as foundation for the later-adopted

25   general sexual immorality claim, or (the principal claim for which CLS should be

26   compensated) the claim to exclude for lack of shared religious beliefs that do not violate

27   another University standard of non-discrimination.  It is possible to ascertain most of the

28

1   work on the failed Establishment Clause claim, which is about $12,137.05 for services

2   roughly between December 20, 2004 and April 15, 2005.  But even with that limited

3   quantification, to which the court gives consideration, the time entries as a whole do not

4   provide a workable method for reducing the hours expended to account in a principled way

5   for CLS's predominant lack of success in this litigation.

6        The court must look to its own familiarity with the extensive work done in this case

7   and make its best assessment of the relative importance and demands on lawyers' time of the

8   successful and unsuccessful parts of CLS's case.  Based on all those considerations, the court

9   finds 20% of the time and value expended is enough, probably more than enough, to account

10  for CLS's actual success in this case.  That reasonable attorneys' fee is $55,000, which is

11  approximately 20% of the $266,262.70 in attorneys' services at their hourly rate value and

12  $8,135.68 in reimbursable attorneys' expenses.

13       **B.    CLS's Request for a Multiplier**

14       A multiplier "is justified only in the rare case where there is specific evidence that the

15  quality of service was superior in light of the hourly rates charged and the success was

16  exceptional." *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1046 (9th Cir. 2000)

17  (citations omitted); *accord Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1215 (9th Cir.

18  1986) ("[A]n upward adjustment of an award of fees by use of a multiplier is justified only

19  in rare, exceptional circumstances." (citations omitted)). "[N]either the novelty of the issues,

20  the complexity of the case, nor the quality of the representation justifies application of a

21  multiplier." *Chalmers*, 796 F.2d at 1215 (citing *Blum v. Stenson*, 465 U.S. 886, 898-99

22  (1984)).

23       CLS's grounds for a multiplier in this case are clearly insufficient.  As discussed

24  above, most of the University's resistence in the litigation was to CLS's original position,

25  which CLS later abandoned.

26

27

28                                  - 21 -

1    **V.    Motion for Expenses**

2         CLS also seeks reimbursement of its expenses incurred during the litigation, including

3    the costs of transportation, parking, car rentals, food, transcripts, depositions, and mail/

4    couriers.  The University argues that CLS's motion is barred by Local Rule LRCiv. 54.1(d),

5    which states:

6                **(d) Prevailing Party Entitlement to Costs.** The party entitled
                 to costs shall be the prevailing party.  Generally, a party in
7                whose favor judgment is rendered is the prevailing party.  The
                 prevailing party need not succeed on every issue to be entitled
8                to costs.  Upon entry of judgment on a motion for summary
                 judgment, the party requesting the summary judgment is the
9                prevailing party. *The Court will not determine the party entitled
                 to costs in actions terminated by settlement; parties must reach*
10               *agreement on taxation of costs, or bear own costs.*

11   (Emphasis added.)  Since  LRCiv. 54.1(d) precludes settling litigants from claiming taxable

12   costs where they have not agreed who is the "prevailing party," no taxable costs will be

13   awarded.

14        However, "[u]nder § 1988, [a plaintiff] may recover as part of the award of attorney's

15   fees those out-of-pocket expenses that would normally be charged to a fee paying client."

16   *Marhoefer*, 24 F.3d at 19 (citations and internal quotations omitted); *accord Davis v. City &*

17   *County of San Francisco*, 976 F.2d 1536, 1556 (9th Cir.) ("[W]e have continued to hold that

18   attorneys' fees awards can include reimbursement for out-of-pocket expenses including the

19   travel, courier and copying costs . . . incurred here."), *vacated in part on other grounds*, 984

20   F.2d 345 (1993).  A local rule barring taxation of costs will not preclude award of these same

21   expenses as a part of the attorneys' fees award.  *Marhoefer*, 24 F.3d at 20.

22        The court has already taken account of the $8,135.68 in litigation expenses and has

23   awarded CLS the same 20% determined to reflect CLS's degree of success in the case as a

24   whole.   The University has not argued that CLS's expenditures were unnecessary or

25   unreasonable, s*ee Marhoefer*, 24 F.3d at 20, and the court finds CLS's claimed expenses

26   reasonable and made in good faith.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS THEREFORE ORDERED** that Plaintiff Christian Legal Society's Motion for Attorney's Fees and Costs (doc. # 123) is granted in part.  The clerk shall enter judgment for the Plaintiff Christian Legal Society Chapter at Arizona State University College of Law against Defendants in their official capacity only, in the amount of $55,000.00.

DATED this 28th day of April 2006.

_____
Neil V. Wake
United States District Judge